UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

IN RE: PAUL C. LARSEN, P.A.,

    Debtor.
_____

LUIS E. RIVERA, II, as Trustee,

    Appellant,

v.

Case No.  2:19-cv-00860-JLB
Bankr. No.  9:17-bk-08133-FMD

PAUL C. LARSEN and PAUL C.
LARSEN, P.A.,

    Appellees.
_____/

# OPINION

Paul C. Larsen, P.A. ("PCL") is a Chapter 7 debtor in the U.S. Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court"). Two of PCL's unsecured creditors—James D. Milliken and Conrad Capital Group, LLC ("Conrad Capital")—brought an adversary action to pierce PCL's corporate veil and hold its namesake (Paul C. Larsen) personally liable for a garnishment judgment. Mr. Milliken and Conrad Capital (collectively, "Judgment Creditors") were later substituted by the Chapter 7 bankruptcy trustee ("Trustee"). After a bench trial and written closing arguments, the Bankruptcy Court concluded that the Trustee did not establish any of the necessary elements for corporate veil-piercing under Florida law. (Doc. 2-175.) The Trustee now appeals, contending that the Bankruptcy Court's ruling was clearly erroneous. While the trial evidence is

susceptible to differing interpretations, the Court cannot say that the Bankruptcy Court's factual findings were clearly erroneous. Thus, after an exhaustive review of the record on appeal and careful consideration of the arguments presented by the parties, the Bankruptcy Court's Order (Doc. 2-175) is **AFFIRMED**, and this case is remanded for further proceedings.

BACKGROUND

I. **Mr. Larsen's Business Dealings in Colorado Fail, Resulting in a Garnishment Judgment Against PCL.**

Some background on the parties' ongoing dispute is instructive. In 2007, Mr. Larsen and Mr. Milliken were business partners who had agreed to purchase and develop land in Colorado through Conrad Capital. Milliken v. Larsen, No. 2011-CV-292, 2013 Colo. Dist. LEXIS 2088, *1 (Colo. Dist. Ct. Feb. 7, 2013). Mr. Milliken was the majority interest holder in Conrad Capital, but Mr. Larsen and his associate were its managers through an intermediary LLC. Id. The Colorado project included the creation of numerous other business entities with a common naming motif of "Breakwater"—most notably Breakwater Capital Group V, LLC ("Breakwater V"). The purpose of the Breakwater entities was to acquire different assets for the Colorado development project; according to Mr. Larsen, these assets were eventually "going to roll together into one project." (Doc. 23-1 at 114:1–8.)

By 2011, the business dealings between Mr. Larsen and Mr. Milliken soured amid accusations of mismanagement, resulting in multiple lawsuits by Mr. Milliken and Conrad Capital against a spider-web of business entities in Colorado state court. One of the claims in these lawsuits was against Breakwater V for breach of a

promissory note.  Mr. Milliken claimed that he had loaned money to Breakwater V—which Mr. Larsen indirectly controlled—with the understanding that the loans would be used for the Colorado development project, but Breakwater V defaulted on the loan.  Milliken v. Larsen, No. 2011-CV-292, 2013 Colo. Dist. LEXIS 2466, *3 (Colo. Dist. Ct. Mar. 22, 2013).  This claim culminated in a 2014 judgment against Breakwater V in the amount of $551,267.22.

To recover on their judgment against Breakwater V, Judgment Creditors obtained garnishment judgments in 2016 against PCL and another entity named Gulfwinds Income Ventures, LLC ("Gulfwinds Income") in Florida state court.  (Doc. 2-51.)  These entities were garnishees to the 2014 Colorado judgment because Gulfwinds Income was a possible debtor of Breakwater V, and PCL was a possible debtor of Gulfwinds Income.  (Doc. 2-175 at 3–4.)

## II. PCL Files for Bankruptcy, and Judgment Creditors initiate an Adversary Action in the Bankruptcy Court to Pierce PCL's Corporate Veil and Hold Mr. Larsen Personally Liable for the Garnishment Judgment.

On September 22, 2017—the same day that Mr. Milliken's counsel was scheduled to depose PCL under Federal Rule of Civil Procedure 69 (presumably with Mr. Larsen as corporate representative)[1]—PCL filed a Chapter 7 petition in the Bankruptcy Court.  PCL listed only $152 in assets against $1,452,220.93 in liabilities.  (Doc. 2-49 at 1.)  Among PCL's unsecured creditors were: (1) Judgment

---

[1] "In aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located."  Fed. R. Civ. P. 69(a)(2).

3

Creditors in the amount of $551,267.22 (equivalent to the garnishment judgment); (2) Gulfwinds Income and Gulfwinds Capital Group LLC ("Gulfwinds Capital"), in the respective amounts of $240,134 and $68,652.49; and (3) Mr. Larsen himself in the amount of $40,900. (Id. at 6–7.)

Judgment Creditors appeared in the bankruptcy proceeding and filed an adversary complaint against PCL and Mr. Larsen (collectively, "Judgment Debtors"), claiming that for the past ten years, PCL was nothing more than an alter ego of Mr. Larsen created to funnel money that he fraudulently obtained from investors to himself. (Doc. 2-5.) According to Judgment Creditors, Mr. Larsen used Gulfwinds Income and Gulfwinds Capital—among other entities with a common naming motif of "Gulfwinds"—to collect money from investors like Mr. Milliken for various projects. The Gulfwinds entities (which Mr. Larsen controlled) would use the investors' money to make "loans" to PCL (which Mr. Larsen also controlled), and Mr. Larsen would then withdraw money from PCL's account to pay for his personal expenses. (Id. at ¶¶ 11–12.) Accordingly, Judgment Creditors asked the Bankruptcy Court to: (1) pierce PCL's corporate veil, (2) hold Mr. Larsen individually liable for PCL's debts, (3) subordinate the unsecured claims of Mr. Larsen and the Gulfwinds entities to the claims of other legitimate creditors in the bankruptcy, and (4) enter a declaratory judgment commemorating the preceding three rulings. (Id. at 8–11.) The Trustee was later substituted as plaintiff in the adversary proceeding and filed an amended complaint against Judgment Debtors,

4

seeking the same relief as Judgment Creditors.  (Doc. 2-22.)  The Judgment Creditors' attorney continued to represent the Trustee as plaintiff.

### III. After a Non-Jury Trial and Written Closing Arguments, the Bankruptcy Court Declines to Pierce PCL's Corporate Veil.

At trial, the Trustee introduced numerous documents containing financial information about PCL and the Gulfwinds entities.  (Docs. 2-51, 2-53, 2-56, 2-57, 2-60, 2-61, 2-62, 2-63, 2-64, 2-66, 2-69, 2-70.)  The content of these documents is largely undisputed.  They show that: (1) PCL was sparsely capitalized; (2) a significant amount of money that was paid into the Gulfwinds entities was transferred to PCL and, ultimately, to Mr. Larsen; and (3) Larsen used PCL's money to pay for various personal expenses.

Mr. Larsen, who represented himself at trial, opted to re-frame these facts rather than dispute them.  He testified that he created PCL in the 1990s as a vehicle for him to collect real estate brokerage commissions and securities commissions.  (Doc. 23-1 at 16–17.)  Mr. Larsen considered PCL to be his "business identity" and he admitted to making most of PCL's business decisions, apart from some unspecified "administrative help."  (Id. at 20:5–21.)  He would use PCL to pay for expenses that he considered business-related, such as employee salaries, office space, and travel.  (Id. at 17:16–18.)

In the mid-2000s, when the real estate market was strong, Mr. Larsen decided "to try and expand [PCL's] business and borrowed money to cover the cost of additional employees and space and expenses."  (Id. at 17:19–24) (emphasis added).  This "borrowed money" included money from the Gulfwinds entities, which

5

Mr. Larsen controlled. Mr. Larsen apparently believed that he could eventually repay any "borrowed" money back with revenue he would receive from his alleged business expansion; this additional revenue never materialized because the real estate market collapsed with the Great Recession. (Id. at 17:25–18:9.) As for the Gulfwinds entities, Mr. Larsen characterized them as "clearing houses" that "kept track" of all the intercompany loans that Mr. Larsen was facilitating among the individual LLCs that he controlled.[2] (Id. at 210:12–21.)

By Mr. Larsen's own admission, not all of this was done with the express knowledge or permission of the investors he solicited for his projects. He testified that he did not "specifically articulate[]" to investors that the Gulfwinds entities would loan their money to PCL, although he claimed "the anticipation was that loans would be extended by Gulfwinds." (Id. at 89:4–25; 108:19–24.) Mr. Milliken testified that he did not know any of the money he invested in Breakwater V would be transferred to Gulfwinds Income, PCL, and Mr. Larsen. (Id. at 168:4–19.) Nevertheless, Mr. Larsen insisted that all of his loans were for legitimate reasons, that the money he withdrew from PCL was consistent with business-related expenses or simply a personal wage, and that none of the Trustee's evidence was in any way indicative of fraud. (Id. at 162:19–164:11; 197:9–199:25.)

---

[2] It is unclear whether these "other business initiatives"—the ones related to Mr. Larsen's various LLCs—are what Mr. Larsen had in mind when he wanted to "expand" PCL's business. (Id. at 197:5–8.) In other words, the record is unclear whether Mr. Larsen wanted to make PCL into something other than a fee-collecting entity, or whether he simply wanted to expand other business ventures to generate more fees for PCL.

6

The Trustee saw things very differently. Its theory of the case was that Mr. Larsen was simply a fraudster who used PCL and the Gulfwinds entities as part of a broad-ranging scheme to defraud investors. At trial, the Trustee focused its case-in-chief on transactions which, in the Trustee's view, had no legitimate business purpose. For example, the Trustee pointed to records of PCL paying for: (1) Mr. Larsen's personal health insurance; (2) renters' insurance and monthly rent for Mr. Larsen's personal residence; (3) Mr. Larsen's automobile insurance; (4) a remodeling of Mr. Larsen's home office; and (5) contributions to churches. (Doc. 10 at 7–8.) Mr. Larsen testified that he believed these were business-related. He explained that he believed health insurance to be a business expense because "the ability [for PCL] to stay in business was dependent completely on [him] to generate . . . revenue." (Doc. 23-1 at 163:1–3.) The rent and rental insurance Mr. Larsen withdrew from PCL's account, was actually for the property that he worked out of (i.e., his personal residence), and the car insurance was for a car that he allegedly "used for the business." (Id. at 63:16–25; 64:18–22.)

The Trustee also noted that Mr. Larsen had repeatedly paid himself "dividends" from PCL, oftentimes shortly after transferring money into PCL from one of the Gulfwinds entities. (Doc. 10 at 5–7.) Mr. Larsen testified that "part of [the] expansion [of PCL] is that [he] have money to live on," and that entailed paying himself "living expenses" and "salary" which were "common in size for five, six, seven years prior." (Doc. 23-1 at 94:13–16, 212:12–15.) The Trustee estimated that PCL distributed $701,405.15 to Mr. Larsen from 2008 to 2015 (about $86,000 a

7

year).  (Doc. 10 at 7.)  Mr. Larsen does not dispute this dollar amount but notes that it should be viewed against PCL's revenue in that same period, which he claims is over $2 million.  (Doc. 15 at 5.)

A ledger of PCL's cash inflows and outflows from 2008 to 2015—prepared by Mr. Larsen using Quicken software and offered into evidence by the Trustee—shows that PCL did indeed have inflows of well over $2 million during the time frame Mr. Larsen cites.  After considering outflows, PCL's only net positive years were in 2010, 2011, and 2012.  (Doc. 2-61.)  The positive balances from 2010 to 2012 seem to be attributable to Mr. Larsen's "loans" from the Gulfwinds entities.  (Id. at 36, 43, 49.)  The ledger also shows money going back into the Gulfwinds entities, which is at least facially consistent with Mr. Larsen's contention that he tried to pay back PCL's "loans."  (Doc. 23-1 at 163:12–14.)

Finally, Mr. Larsen offered into evidence a transcript of the proceedings in Colorado state court.  (Doc. 2-122.)  In those proceedings, the Colorado court found that Breakwater V owed money to the Judgment Creditors, but it also held that the causes of action against Mr. Larsen in his individual capacity lacked merit because he did not breach any fiduciary duty.  (Id. at 6, 11, 12.)

After hearing the parties' testimony and receiving written closing arguments, the Bankruptcy Court held that the Trustee proved none of the elements required for piercing PCL's corporate veil.  (Doc. 2-175).  As to the element of fraudulent purpose, the Bankruptcy Court explained:

> The [Trustee's] exhibits do not reflect that the listed transactions were fraudulent or made for an improper purpose.  For example, in [its] post-

8

trial Closing Brief, the Trustee described only two payments from [PCL's] accounts to show the allegedly fraudulent or improper use of [PCL's] corporate form: a check dated January 17, 2008, to Direct TV in the amount of $53.25 for internet service at a home office, and a check dated December 31, 2016, to Stephanie Miller LLC in the amount of $2,800 for accounting services.

[The Trustee] makes general assertions . . . that [PCL] was not adequately capitalized, that many "loans" made from Larsen's other entities to [PCL] corresponded to transfers from [PCL] to Larsen, and that Larsen used [PCL]'s assets to pay for his personal expenses and personal legal fees. But [the Trustee] does not identify specific instances from the exhibits showing that Larsen improperly "funneled" funds to himself through [PCL], or demonstrate how any particular transaction was fictitious or fraudulent.

(Id. at 10.) The Trustee timely appealed. (Doc. 2-1.)

### STANDARD OF REVIEW

This Court must accept the Bankruptcy Court's factual findings unless they are "clearly erroneous." In re Chalik, 748 F.2d 616, 619 (11th Cir. 1984); see also Fed. R. Bankr. P. 7052 (incorporating the "clearly erroneous standard of Federal Rule of Civil Procedure 52(a)(6) for adversary proceedings in bankruptcy). A factual finding is clearly erroneous if, after reviewing the evidence, the Court is "left with the definite and firm conviction that a mistake has been committed." Lykes Bros. v. U.S. Army Corps of Eng'rs, 64 F.3d 630, 634 (11th Cir. 1995) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). If the Bankruptcy Court's view of the evidence is "plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). The Bankruptcy Court's legal conclusions are reviewed de novo. In re Sublett, 895 F.2d 1381, 1383 (11th Cir. 1990).

9

## DISCUSSION

PCL is a Florida professional association, and the parties do not dispute that Florida law on veil piercing governs this case. In Florida, the party seeking to pierce a business entity's veil bears the burden of proving each necessary element by a preponderance of the evidence. In re Hillsborough Holdings Corp., 176 B.R. 223, 244 (M.D. Fla. 1994). While the doctrine of corporate veil piercing obviously arose in the context of corporations, Florida courts also apply it to professional associations and other corporate-like entities. See Rashdan v. Sheikh, 706 So. 2d 357, 357 (Fla. 4th DCA 1998) (applying concept to a professional association).

The Supreme Court of Florida has held that piercing a corporate veil requires the claimant to show that: (1) "the corporation is in actuality the alter ego of the stockholders"; and (2) "it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes." Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1120 (Fla. 1984) (quoting Advertects, Inc. v. Sawyer Indus., 84 So. 2d 21, 24 (Fla. 1955)). Florida's intermediate appeal courts also "tend to incorporate the elements of causation and damages into the standard for piercing the corporate veil." N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc., 666 F. Supp. 2d 1299, 1306 (M.D. Fla. 2009) (collecting cases). Accordingly, the three elements of corporate veil-piercing in Florida are:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and

10

> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

Seminole Boatyard, Inc. v. Christoph, 715 So. 2d 987, 990 (Fla. 4th DCA 1998) (citation omitted).  As to the second element, Florida law does not permit a "general presumption of fraud," and therefore claimants must "affirmatively prove fraud or deliberate misconduct in conjunction with a veil-piercing claim." In re Hillsborough Holdings Corp., 176 B.R. at 245; see also Robertson-Ceco Corp. v. Cornelius, No. 3:03-cv-475-RV-EMT, 2007 WL 1020326, at *7 (N.D. Fla. Mar. 30, 2007) (same).

Here, the Bankruptcy Court held that the Trustee failed to establish all three elements of corporate veil-piercing under Florida law.  (Doc. 2-175.)  On appeal, the Trustee argues that the Bankruptcy Court's holding was clearly erroneous because the evidence strongly showed that PCL was Mr. Larsen's alter ego, that Mr, Larsen used PCL to defraud investors, and that Mr. Larsen's abuse of PCL's corporate form harmed Judgment Creditors.  (Doc. 10.)

After carefully reviewing the record, this Court concludes that the Bankruptcy Court did not clearly err by holding that the Trustee failed to prove Mr. Larsen used PCL fraudulently or for an improper purpose.  Other triers of fact might have "weighed the evidence differently," but the Bankruptcy Court's finding on the fraudulent purpose element is at least "plausible in light of the record viewed in its entirety." Anderson, 470 U.S. at 574.  Because this Court has not been "left with the definite and firm conviction" that the Bankruptcy Court erred, it must affirm.  Lykes Bros., 64 F.3d at 634 (quoting U.S. Gypsum Co., 333 U.S. at 395).

11

And because there was no clear error on the second element of the veil-piercing analysis, the Court need not address the other elements.

The Trustee contends that the Bankruptcy Court clearly erred in its determination that "the Trustee described only two payments from [PCL's] accounts to show the allegedly fraudulent or improper use of [PCL's] corporate form." (Doc. 2-175 at 10.)  In the Trustee's view, the record "shows far more than two transactions" where Mr. Larsen used PCL "to pay for his personal health insurance, rent and renter's insurance for his personal residence, automobile insurance for his vehicle, remodeling his home office, and his personal legal fees." (Doc. 10 at 16.)  But it is not clear that any of these transactions were indeed fraudulent.

Mr. Larsen testified that PCL was his "business identity." (Doc. 23-1 at 20:5–21.)  It is not per se fraudulent for a small business owner's personal and expenditures to overlap.  Cf. In re Kuwik, 511 B.R. 696, 706 (Bankr. N.D. Ga. 2014) (explaining, in the context of a Chapter 13 "income" calculation, "that often there is considerable overlap between a sole proprietor's business and personal expenses: for example, vehicle(s), fuel, insurance, phone, computer, internet service, clothing, travel, meals, and use of a home office").  Here, Mr. Larsen testified that many of these expenses were related to his various business dealings.  "(Doc. 23-1 at 63:16–25, 64:18–22, 163:1–3.)  The credibility of Mr. Larsen's testimony might be debatable, but his account is at least plausible, and the Court therefore declines to reweigh the evidence in the record.  Anderson, 470 U.S. at 574.  The Bankruptcy Court was in the best position to make credibility determinations.

The Trustee further contends that there are "a number of transactions in which Larsen improperly funneled money to himself by transferring investors' funds from the Gulfwinds Entities to PCA." (Doc. 10 at 16.)  According to the Trustee, Mr. Larsen "made distributions to himself for no apparent reason" and that his "entire course of conduct was fraudulent" because he used PCL "as a shell to funnel money from investors in the Gulfwinds Entities, and then make fraudulent loans to other entities . . . and distribute the money to Larsen personally." (Id. at 16–17.)  This account overstates the Trustee's evidence.

There was little meaningful discussion of the Gulfwinds entities at the trial, much less evidence that investors in these entities were "defrauded."  Mr. Larsen acknowledged that the investors "lost money" because "people didn't pay us," but he denied that the Gulfwinds entities were merely "arbitrary channel[s]" for transferring money into PCL.  (Doc. 23-1 at 87:25–88:1.)  Mr. Larsen admitted that not every Gulfwinds investor knew specifically about his loans to PCL, but they generally "anticipat[ed] . . . that loans would be extended."  (Id. at 89:8–9.)  He also characterized the Gulfwinds entities as "clearing houses" that "kept track" of various intercompany loans.  (Id. at 210:12–21.)  Moreover, PCL's ledger shows money being deposited back into the Gulfwinds entities, which is consistent with Mr. Larsen's contention that he tried to pay back PCL's "loans" from the Gulfwinds entities.  (Id. at 163:12–14.)  His testimony—and the Bankruptcy Court's apparent acceptance of it—is at least plausible.  Anderson, 470 U.S. at 574.

13

As far as distributions to himself, Mr. Larsen considered the "dividends" from PCL to be his salary, which remained uniform across multiple years. (Id. at 94:13–15, 212:12–14.) He also testified that he paid taxes on the dividends as personal income, and that part of his attempt to expand PCL's business prior to the Great Recession included "money [for him] to live on." (Id. at 205:16–20, 212:12.) A small business owner paying himself a salary—even when the business is in significant debt—does not necessarily show fraud. See Ally v. Naim, 581 So. 2d 961, 963 (Fla. 3d DCA 1991) ("The fact that a closely held corporation compensates its sole shareholder and principal employee in the ordinary course of that corporation's business does not, without more, satisfy the tests [for corporate veil-piercing in Florida]"); see also Robertson-Ceco Corp., 2007 WL 1020326, at *7.

Finally, the Trustee contends that Mr. Larsen did not properly document the various loans between his various entities or the terms they were made on. (Doc. 10 at 17.) Mr. Larsen freely admitted that PCL's bookkeeping was sloppy because that was not his "strong suit." (Doc. 23-1 at 198:13–16.) But sloppy recordkeeping does not rise to the level of fraud and certainly does not warrant piercing the corporate veil. See Fanslow v. Stoner (In re Stoner), No. 18-30213, 2019 Bankr. LEXIS 2893, at *14 (Bankr. S.D. Ohio Aug. 20, 2019) ("[S]loppy accounting and record keeping is a wide-spread occurrence among small business entities . . . .").

To sum things up, the Trustee's theory of the case overpromised and underdelivered. The Trustee claimed it would prove a wide-ranging fraudulent scheme by which Mr. Larsen sought to defraud not just Mr. Milliken, but many

14

other investors. The Bankruptcy Court, however, found that a preponderance of the evidence did not support these sweeping assertions of fraud. (Doc. 2-175 at 10) (noting that the Trustee made "general assertions" of fraud without identifying "specific instances"). Despite the Trustee's insistence, the Court cannot find any clear error in the Bankruptcy Court's conclusion.

While the evidence at trial may have created a fraud-like aura capable of persuading some triers of fact, it is equally plausible that Mr. Larsen—like many others—was a businessman who got burned by the Great Recession for playing fast and loose with speculative real-estate investments. Mr. Larsen's poor business judgment does not rise to the level of actual fraud. In re Hillsborough Holdings Corp., 176 B.R. at 245; Robertson-Ceco Corp., 2007 WL 1020326, at *7. This Court will not substitute its judgment for that of the Bankruptcy Court, which conducted the trial, observed the witnesses' demeanor, and weighed the evidence.

## CONCLUSION

The Bankruptcy Court's Order (Doc. 2-175) is **AFFIRMED**. The case is **REMANDED** to the Bankruptcy Court for further proceedings consistent with this Opinion. The Clerk is **DIRECTED** to transmit a copy of this Opinion to the Bankruptcy Court, terminate the appeal, and close the file.

**ORDERED** in Fort Myers, Florida, on February 17, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE